**Rao Electrical Equipment Co., Inc., a Corporation, Plaintiff-Appellee, v. Macdonald Engineering Co., a Corporation, Defendant-Appellant.**

Gen. No. 54,620.

First District, Second Division.

April 28, 1970.

Rehearing denied June 10, 1970.

Baker & McKenzie, of Chicago (Francis D. Morrissey, John T. Coleman, John W. Dondanville, and Timothy J. Egan, of counsel), for appellant.

Neistein, Richman & Hauslinger, of Chicago (Morton J. Hauslinger, Harry A. Young, Jr., and Allen C. Engerman, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

The defendant, Macdonald Engineering Co. (hereinafter referred to as Macdonald), prosecutes this interlocutory appeal (Ill Rev Stats 1969, c 110A, § 307) from a temporary injunction order, as later modified by the court, entered against it and in favor of the plaintiff, Rao

Electrical Equipment Co., Inc. (hereinafter referred to as Rao).

In its verified complaint Rao alleged that it is a foreign corporation in Illinois with its principal place of business in New York City whereas Macdonald is also a foreign corporation but is qualified to do business in Illinois with its principal place of business in Chicago; that on or about February 7, 1969, a written contract was entered into between Rao as electrical subcontractor and Macdonald as general contractor for the electrical work required in the construction of a cement plant in Pennsuco, Florida, on premises owned by Maule Industries, Inc.; that Rao proceeded to perform under this written contract which was later modified by the mutual consent of the parties, as the contract price was increased from $1,067,000 to $1,251,154, exclusive of $250,000 overtime pay and the completion date was allegedly changed from August 1, 1969 to a date to be mutually agreed upon by Rao and Macdonald. Thereafter, on or about June 18, 1969, Rao and Koppers Company, Inc. entered into a written contract whereby Rao, as subcontractor, was to install for Koppers on the same cement plant site in Pennsuco, Florida, certain electrical air pollution equipment for the price of $79,400 (Koppers was another subcontractor for Macdonald performing other work on the Florida project) ; and that the written contract between Rao and Macdonald, which contract was attached to the complaint as an exhibit, contained a provision stating that:

> "Should the Sub-contractor (Rao) fail to prosecute said work or any part thereof with promptness and diligence, or otherwise violate the terms of this agreement, the General Contractor (Macdonald) shall be at liberty, after three (3) days' written notice to the Sub-contractor, to provide such labor or

161

materials as may be necessary to complete the work, and to deduct the cost and expense thereof from any money then due or thereafter to become due to said Sub-contractor under this agreement, and the General Contractor shall be at liberty to take possession, for the purpose of completing the work included in this contract, of all materials, tools, scaffolding and appliances thereon, and to employ or contract with any other person or persons to finish the work and provide the materials therefor."

The verified complaint then referred to a letter prepared on Macdonald's stationery, signed by Roy White, Vice-President of Macdonald, and hand-delivered to Rao in Florida on October 11, 1969. The typed letter, attached to the complaint as an exhibit, stated that since Rao had advised Macdonald that it (Rao) was not going to perform any further work under its written contract with Macdonald, Macdonald—pursuant to its contract with Rao—would take possession of all materials, tools, scaffolding and appliances on the job site for the purpose of completing the work and would withhold all further payments to Rao. In its complaint Rao also alleged that on October 10, 1969, the date of the typed letter, it employed over one hundred men on the project site and on that date Macdonald owed it $550,364.45; that on October 14, 1969, agents and employees of Macdonald broke the locks on Rao's tool sheds located on the construction site and wrongfully confiscated and took possession of: (1) Rao's tools and equipment inventory valued in excess of $52,000; (2) Rao's vehicles valued at $25,750; and (3) Rao's supply and material inventory located on the site which was not valued in the complaint.

In conclusion, Rao's complaint alleged that it had never refused to complete the work required of it under the written contract with Macdonald but rather was per-

forming with promptness and diligence; that Macdonald had wrongfully prevented Rao's employees from working on the job site thereby keeping Rao from further performing under the contract and had wrongfully taken Rao's tools, materials, supplies and equipment in addition to wrongfully preventing Rao from performing its contract with Koppers Company by such conduct Rao alleged that Macdonald, by its wrongful actions, had caused Rao to suffer irreparable loss and damage for which it had no adequate remedy at law and prayed for the following relief: (1) that a temporary mandatory injunction be entered immediately, to be made permanent later after a final hearing, whereby the court would compel Macdonald to return to Rao all of the latter's tools, equipment, materials and supplies; (2) that a temporary injunction be entered against Macdonald, to be made permanent later after a final hearing, enjoining the defendant corporation from terminating its contract with Rao and attempting to employ other electrical subcontractors to perform Rao's work and enjoining Macdonald from all actions tending to prevent Rao from performing its contractual obligations with Macdonald and with Koppers Company, Inc.; (3) that a temporary injunction be entered against Macdonald enjoining it from instituting proceedings in other courts in other states against Rao wherein the subject matter would be the same as the matters presented in the complaint at bar; and (4) that a money judgment be entered in Rao's favor and against Macdonald for the sum of $550,364.45 and statutory interest.

Macdonald filed a motion to strike the complaint alleging that chancery had no jurisdiction since Rao had an adequate remedy at law for damages arising from the alleged breach of contract. After argument, this motion was denied. Macdonald filed its verified answer admit-

ting the existence of the written contract between the parties but denying that Rao had performed under this contract and affirmatively stating that Rao had refused to finish the work required by the contract.

The answer went on to state that on February 9, 1969, Rao forwarded a letter to Macdonald which indicated that Rao would complete its subcontract with Macdonald by September 1, 1969, with no overtime being necessary but that on September 1, 1969, Macdonald gave Rao a second extension of time and agreed to overtime pay which eventually resulted in the authorization of six ten-hour workdays each week as Rao had requested; that on October 10, 1969, Rao informed Macdonald that it would complete its subcontract only upon three conditions: (1) that Macdonald pay immediately all of Rao's invoices for material and labor which had been submitted to Macdonald but not yet paid by it; (2) that Macdonald pay over immediately to Rao the 15% retainage which it had been withholding from each monthly payment; and (3) that the contract between them be changed from a lump-sum contract to a cost plus 5% (of cost) contract.

In conclusion, the sworn answer alleged that on October 10, 1969, Rao had completed only 30% of the electrical work whereas 96% of the cement plant was completed including 92% of the machinery and 70% of the piping; and that the court enter judgment for Macdonald and against Rao.

At the numerous hearings held on Rao's motion for a temporary injunction order, three witnesses testified for Rao: Chester Yablonski and Frank Sineri, both Rao Vice-Presidents, and Roy White, Vice-President of Macdonald, who testified as an adverse witness under section 60 of the Civil Practice Act (Ill Rev Stats 1969, c 110, § 60). Testifying for Macdonald were Roy White and James W. Macdonald, Jr., President of Macdonald, and Yablonski, who was questioned as an adverse witness.

These witnesses all agreed that under the written contract between Rao and Macdonald, Rao was to submit invoices monthly, and after the architect approved them as reflecting work actually completed by Rao on the site, Macdonald was to pay these invoices within a month and withold 15% retainage; that Macdonald was the architect, designer, and general contractor for the cement plant so that it both approved Rao's invoices as architect and paid them as general contractor; that Macdonald promptly paid Rao's first six invoices and also the seventh, after Rao had adjusted it in accordance with Macdonald's suggestion so that it reflected only the work actually done during the billing month, but that Macdonald had not paid Rao's eighth invoice, the billing for work done in September, 1969, which had been submitted to Macdonald in early October, 1969, and which had been in its possession for ten or fifteen days as of the dates of the hearings on Rao's motion for a temporary injunction order; that although the contract between the parties had a completion date of August 1, 1969, this was later extended to September 1, 1969, then to October 15, 1969, and eventually to some future date; and that as Rao worked on its electrical subcontract with Macdonald, it was concurrently working on its Koppers contract located on the same cement plant site so that Rao's tools, vehicles, materials, and supplies used on both contracts were commingled at the construction site.

As to the breach of contract, however, each side's witnesses charged the other side with the breach. Testifying for Rao, Yablonski and Sineri both stated that during the week of October 6–10, 1969, Rao had about one hundred and twenty-seven men working on the site with ninety men working six ten-hour days on the Macdonald contract and thirty-seven men working on the Koppers contract; that Rao's tools located on the site were valued at $52,000, its vehicles at $25,000, and its materials and

supplies at about $200,000; that when Yablonski and Sineri spoke with Roy White on the construction site in Florida on or about October 3, 1969, many dates of completion for the electrical subcontract were discussed including December 7, 1969, for the completion of one unit and December 24, 1969, for completion of the entire electrical work but the parties never agreed to complete the contract by a date certain; that on or about October 9, 1969, Yablonski said to White in Sineri's presence that the overtime currently being worked by Rao's employees coupled with the additional equipment, tools, and supplies necessary to support the acceleration in construction was putting a burden on Rao's cash position and he recommended three alternatives to aid Rao: (1) Macdonald was to pay in full all of Rao's invoices, meaning Macdonald would immediately pay Rao's September billing, would surrender the 15% retainage, and there would be no retainage applied to future invoices; or (2) Macdonald was to keep $75,000 of the retainage but was to pay the rest to Rao and, in the future, was to reimburse Rao fully for all its costs plus 5% overhead; or (3) if Maule, the owner, thought that Rao should be replaced as electrical subcontractor, Rao would assist in the transition so as not to delay construction but wanted to be paid in full for all invoices it had submitted to Macdonald including the retainage.

Continuing, Yablonski and Sineri testified that in response to these suggestions, White stated that he believed all three proposals would be unacceptable; that during the early morning hours of October 11, 1969, White came to Yablonski's motel room and in the presence of Yablonski, Sineri, and Joseph Rao Jr., asked for a memo from Rao, through Yablonski, which would state that if none of the conditions were met, Rao would not proceed with the electrical subcontract but Yablonski declined saying Rao wanted to complete its contract with

166

Macdonald; that eight hours later White returned to Yablonski's motel room at a time when Sineri and Rao Jr. were again both present, and handed Yablonski a typed letter, the same letter referred to and attached to Rao's complaint, advising Rao that since it had advised Macdonald that Rao was not going to perform further under its contract, Macdonald would make no further payments and was going to take possession of all materials, tools, scaffolding and appliances found on the construction site for the purpose of completing the work; that Yablonski told White at that time that he had never advised Macdonald that Rao was not going to complete the contract but White replied that he had to leave this letter with Yablonski.

Sineri admitted that he called White on October 10, 1969 and told him that there might be a layoff after Monday's (October 13) workday; that on October 3, 1969 Sineri had reviewed the actual electrical installation on the site and found it to be about 44% completed; and that on Tuesday, October 14, 1969 Rao had only eleven men on the job as compared with over one hundred and twenty-five employed the prior week.

Yablonski alone testified that when Rao's employees went to the job on Tuesday, October 14, 1969, they found another electrical subcontractor on the site—Lowry Electric Company—who informed them that they were replacing Rao; that either Macdonald or Lowry had removed the locks on the tool boxes replacing them with new locks and had taken Rao's trucks; that Rao's employees were also unable on October 14, 1969, and thereafter, to obtain materials, supplies, and tools located on the site and hence have been prevented from performing its contracts with Macdonald and Koppers; and that Rao was ready to continue its performance when its materials, tools, supplies, and vehicles were returned to it.

167

Roy White testified that the contract between Rao and Macdonald had a completion date of August 1, 1969, but this was extended to September 1, 1969, then to October 15, 1969, and eventually Macdonald sent Rao a letter inquiring as to whether or not Rao could have one system ready by the first week of November and the entire contract completed by the first week of December, 1969, but received no definite answer in reply; that he met with Yablonski and Sineri in White's motel room in Florida on October 9, 1969, and it was there that the two men told White, about six times, that Rao would leave the job site unless two conditions were met: (1) its unpaid invoices were paid off in full, including the 15% retainage theretofore held by Macdonald; and (2) a new contract was executed between the parties under which Rao was to receive reimbursement for all its future costs and, in addition, a 5% profit based on the costs incurred, but that he (White) responded by saying that neither Macdonald nor Rao could go beyond the framework of the lump-sum contract between them and Yablonski replied that in that case Rao might lay off its men starting the following Monday, October 13, 1969.

Continuing, White testified that on October 10, 1969, Sineri told him that before Sineri called the union and laid off Rao's employees, he was going to wait until Rao Sr. talked to Macdonald Jr. and that thereafter on October 10, 1969, Sineri called him again and informed White that Rao intended to lay off its employees on Monday, October 13, 1969, unless Macdonald paid off all Rao's invoices to date including retainage; that on October 11, 1969, White asked Sineri, Yablonski, and Rao Jr. for a written memo to the effect that Rao would leave the job unless these conditions were met, but did not receive it, and was told that Rao Sr. had talked with Macdonald Jr. over the telephone so that the Rao supervisory employees did not know what to do; that he gave Yablonski the typed letter on October 11, 1969 at which time Ya-

168

blonski stated that Rao had only said it was going to lay off some men and had never said they were not going to perform under the contract; that Rao dismissed all their employees from the Macdonald contract after work on Monday, October 13, and that Macdonald alone, during the afternoon of October 14, 1969, and in accordance with directions from Maule's attorney, took possession of Rao's materials, supplies, tools and vehicles found on the construction site. In conclusion, White stated that although the cement plant was 90% constructed, exclusive of the electrical work, and electricians are normally only 10–15% behind the other trades, his estimate of October 13, 1969, made at the site, showed that Rao had only completed 30% of its electrical work, although it had billed Macdonald for 88% of the materials and 44% of the labor; and that on October 13, 1969, he had talked in Florida with Jim Lowry of Lowry Electric Co. and thereafter a verbal agreement was made on October 14, 1969, between Lowry and Macdonald whereby Lowry would replace Rao and would complete the electrical subcontract for a fee of cost plus $75,000, with one electrical system completed by December 7 and the entire electrical work completed by December 31, 1969.

Testifying as an adverse witness during the presentation of Macdonald's evidence, Yablonski stated that Rao men in Florida had been in contact with Rao Sr. in New York City on October 10, 1969, and he had told White of this on October 10 during their conversation but he (Yablonski) had not talked with Rao Sr.

James Macdonald Jr., president of Macdonald Engineering Company, testified that in the evening of October 9, 1969, he received a telephone call at his home in Kenilworth, Illinois, from Roy White informing him that Rao was going to lay off their employees on Monday, October 13, 1969, unless Macdonald paid its invoices immediately, including all retainage heretofore held, and the contract was changed from lump-sum to cost plus

5% of cost; that the next morning Macdonald Jr. called Rao Sr. in New York to be sure this was Rao's position and Rao told him that "he had put a lot of money into this job and was not going to continue unless the new terms were met," whereupon Macdonald replied that he would not change the terms of the contract between the parties but he would aid Rao's cash position by paying its invoices twice a month instead of monthly, by reimbursing it weekly for its overtime pay, and by paying Rao's September invoice, net of retainage, if the work reflected thereon was actually shown to be done on the site. Macdonald Jr. also said he offered to meet with Rao Sr. and with representatives of Maule Industries, the owner of the cement plant, in Chicago, New York City, or Miami to discuss the problem and to keep construction in progress. Rao Sr. reiterated his intention not to put any more money into the job but did say he would call Macdonald Jr. later in the day after talking with Sineri in Florida.

In his return call, Rao said that his company wanted to finish the contract but that by Monday, October 13, 1969, Macdonald would have to pay all of Rao's outstanding invoices, would have to remit the entire retainage fund, and from then on would have to pay Rao for all its costs incurred in the job without any limit. Macdonald Jr. refused to accept these terms saying the parties were bound by the lump-sum contract and Rao stated that his men would be off the job on Monday night, October 13, 1969. Macdonald Jr. testified that he then told Rao that Macdonald would have to take over the job and Rao replied that was of no consequence to him as he had put enough money into it. Macdonald Jr. then called White in Florida and told him of this development.

In cross-examination, Macdonald stated that up to October, 1969, Rao's workmanship was satisfactory but not its progress since it failed to keep up with the other construction work and that although Rao wanted a Jan-

170

uary 15, 1970 completion date for one electrical unit, this was unacceptable to Macdonald who wanted to finish the job in December, 1969.

After hearing this evidence, the court found, among other things, that Macdonald's actions in taking possession of Rao's materials, tools, vehicles, and supplies were unwarranted and unlawful, and prevented Rao from performing under its subcontract with Koppers; that Macdonald's retention of these items was causing irreparable injury to Rao; and that Rao had no adequate remedy at law. The court entered a temporary injunction restraining Macdonald, its officers, agents, attorneys, and those in privity with it, from all actions tending to prevent Rao's performance of its contract with Koppers, from instituting proceedings in other courts in other states against Rao wherein the subject matter of the proceedings would be substantially the same as the matters alleged in Rao's complaint, and from installing, removing, using or handling the materials presently located on the site of the cement plant and not yet permanently installed. The court refused to enjoin Macdonald from terminating its contract with Rao and from employing another electrical subcontractor to replace Rao but did enter a temporary mandatory injunction compelling Macdonald to return to Rao all of Rao's property which Macdonald had seized. The matter of the $550,-364.45 money judgment was continued to a later date since no evidence had yet been heard. Macdonald was given leave to file a counterclaim.

Macdonald's later motion to dissolve the injunction was denied but thereafter the court modified the terms of the temporary injunction by dissolving that portion restraining Macdonald from installing, removing, using or handling materials located on the job site and not yet permanently installed except that Macdonald was still enjoined from handling materials which Rao had to use to complete its contract with Koppers. This modifi-

cation was required so that construction work could begin again, but more importantly, the materials were on the job site, but Rao had apparently been unable to pay its suppliers. Rao presented unpaid invoices totalling $165,000. The court ordered Macdonald to deposit this sum in a special checking account so as to satisfy these possible lien claims and in exchange Macdonald was allowed to use the materials on the site since it had now paid for them. An accounting between the parties as to the $165,000 was to be conducted at a later date.

Although Macdonald raises many points on appeal, we are of the opinion that it is necessary to discuss only one of them. We hold that the remedy of injunction was improper in this case as the parties had an adequate remedy at law for breach of contract. It is apparent from the pleadings and from the evidence that although Rao filed its complaint in the Chancery Division of the Circuit Court of Cook County, the crux of its case involved breach of contract. Each side, in its pleadings and evidence, charged the other with such breach. It was Rao's position that Macdonald materially breached the contract by serving it with a premature written notice of termination, whereas Macdonald contended that Rao materially breached the contract by Rao Sr.'s refusal to perform further unless the terms of the contract were materially altered, which caused the termination notice to be served later on Yablonski.

█ It was the duty of the trial judge to remit these parties to the Law Division where either side could demand trial by jury. Cook County v. Davis, 143 Ill 151, 32 NE2d 176 (1892). There was no allegation in the complaint nor was any evidence presented that Macdonald was insolvent. Thus, if the jury returned a favorable verdict, Rao could apparently collect a money judgment from Macdonald for material breach of contract. Since Rao had an adequate remedy for the recovery of money damages, it was not entitled to injunctive relief, (Tanton v. Boomgarden, 79 Ill App 551, 556–57 (1898);

172

Lipkin v. Burnstine, 18 Ill App2d 509, 152 NE2d 745 (1958)) including a mandatory injunction which is not regarded with judicial favor but rather is used only with caution in cases of great necessity. Lyle v. City of Chicago, 357 Ill 41, 191 NE 255 (1934). In the case at bar, a temporary mandatory injunction was granted.

■ Regarding the taking of Rao's tools, materials, supplies and vehicles, Rao had an adequate remedy against Macdonald as it could bring, in the proper forum, an action of replevin or for money damages on a theory of conversion, litigating therein the issue of whether or not the taking was wrongful. As for Macdonald's actions interfering with Rao's performance of its contract with Koppers, this would be an additional element of compensatory damages in Rao's suit against Macdonald for breach of contract. In our opinion, Rao had a complete and adequate remedy at law by recovery of damages so that remedy by injunction was not available.

■ Rao maintains, citing 2 ILP Appeal & Error, § 173, at pages 234–35, that Macdonald consented to the entry of the temporary injunction order affecting the Koppers contract and the return of the tools, supplies, materials, and vehicles so that these portions of the order cannot be reviewed since the trial court was not required to make a judicial determination. Although counsel for Macdonald did say on some occasions that Macdonald agreed to return Rao to the site so that it could complete the Koppers contract and did agree to return Rao's tools, materials, supplies, and vehicles, he always denied that Macdonald's actions were unlawful contending they were completely justified under the written contract with Rao permitting such seizure. The court recognized this position and in its temporary injunction order expressly found that Macdonald's actions were unwarranted and unlawful. Because Macdonald always denied this, the order—on its face—shows a judicial determination. The order itself does not show any

173

notation that Macdonald, by its trial counsel, agreed to such a determination. Furthermore, the voluminous record filed in this case shows that counsel for Macdonald, throughout the proceedings, asserted that trial court had no jurisdiction in the litigation. We find that Macdonald never consented to any portions of the order and that a judicial determination is involved which is reviewable.

Rao also asserts that had the order not been entered, it (Rao) would have suffered a forfeiture and irreparable harm for which it had no adequate remedy at law. The contract between the parties provided that:

"Should the Sub-contractor (Rao) fail to prosecute said work or any part thereof with promptness and diligence, or otherwise violate the terms of this agreement, the General Contractor (Macdonald) shall be at liberty, after three (3) days' written notice to the Sub-contractor, to provide such labor or materials as may be necessary to complete the work, and to deduct the cost and expense thereof from any money then due or thereafter to become due to said Sub-contractor under this agreement, and the General Contractor shall be at liberty to take possession, for the purpose of completing the work included in this contract, of all materials, tools, scaffolding and appliances thereon, and to employ or contract with any other person or persons to finish the work and provide the materials therefor."

The trial judge held that this provision was unconscionable in that the General Contractor alone made the decision as to when it should be invoked. The court also characterized it as a vicious forfeiture and said that the termination notice was insufficient since Macdonald did not advise Rao regarding the date on which the items would be seized.

 In our opinion this provision was not unconscionable but rather impliedly recognized that the general

174

contractor had a separate contract with the owner of the premises and simply could not afford a delay in construction caused by a dilatory subcontractor or one who otherwise violated the terms of the contract. The subcontractor was to be given three days' written notice apparently in the hopes that it would correct any deficiency so that the general contractor would not have to make any change. If the subcontractor was of the opinion that the general contractor was acting arbitrarily, it would have a remedy at law for breach of contract, but construction work would continue.

■ As to the notice of termination, it did state that Macdonald, pursuant to its contract with Rao, would take possession of the items at the site for the purpose of completing the work. The contractual requirement of three days' written notice was thus reasonably read into the termination notice. Furthermore, Macdonald did not seize Rao's property at the site until three days had passed and only after Rao had laid off most of its employees. The termination notice served on Rao was proper here.

■ Regarding the forfeiture point, we have neither been cited to nor have we found any Illinois case defining a forfeiture within this factual setting. The Colorado Supreme Court in Woitchek v. Isenberg, 151 Colo 544, 379 P2d 392, 394 (1963), defined a forfeiture as an involuntary divestiture of specific property without compensation in consequence of some default or act forbidden by law. Applying that definition to the instant case, we are of the opinion that no forfeiture is involved for two reasons: (1) Macdonald was given the right to possess only temporarily Rao's property for the limited purpose of completing the electrical sub-contract work; and (2) under the contract, such a use served to mitigate damages as Rao was to be compensated, in the end, for the use of its materials, supplies, and tools found on the site. By using Rao's property, Macdonald would not

have to reorder, construction would hopefully not be greatly delayed, and the costs of completion would be reduced. Since another provision of the contract provided that in the event Macdonald had to take over the electrical subcontract, Rao would receive, after construction was completed, the unpaid balance of the amount to be paid it under its contract, less the expenses incurred by the general contractor for costs of completion, it will be seen that Macdonald, by using Rao's materials, supplies, tools and vehicles on the site, would be reducing the costs of completion, thereby serving to increase the sum to be paid to Rao eventually. Hence, Rao is not the victim of a forfeiture but is gaining the benefit of a provision concerning mitigation of damages. The cases upon which Rao chiefly relies, Handzel v. Bassi, 343 Ill App 281, 99 NE2d 23 (1951), and Illinois Merchants Trust Co. v. Harvey, 335 Ill 284, 167 NE 69 (1929), do involve examples of the use of equity to enjoin forfeitures since the involuntary divestiture of property without compensation in consequence of a default was involved in the cited cases. Since we hold that no forfeiture is involved in the instant litigation, the cases are not persuasive.

The temporary injunction order is reversed, any writs issued thereunder are dissolved, and the cause is remanded with directions that it be transferred to the Circuit Court of Cook County—Law Division, for further proceedings.

Reversed and remanded with directions.

McCORMICK, P. J. and BURKE, J., concur.