LAKE SHORE CLUB OF CHICAGO, Plaintiff-Appellant, *v.* LAKEFRONT REALTY CORPORATION, Defendant-Appellee.—(NORTHWESTERN UNIVERSITY, Intervening Defendant-Appellee.)

First District (1st Division)    No. 78-58

Opinion filed December 17, 1979.

Terrence E. Leonard, of Chicago, for appellant Lake Shore Club of Chicago.

Sidney Z. Karasik and Ira D. Schultz, both of Chicago, for appellee Lakefront Realty Corporation.

Robert A. Downing, Arlene C. Erlebacher, and Martha P. Mandel, all of Sidley & Austin, of Chicago, for appellee Northwestern University.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Lake Shore Club of Chicago filed suit seeking to enjoin Lakefront Realty Corporation's sale of property to Northwestern University. Lake Shore Club of Chicago also sought specific performance of its right of first refusal granted in the lease between the Club and Lakefront Realty. After an evidentiary hearing the court denied the relief sought. Plaintiff Club appealed.

On appeal, plaintiff argues that (1) the Club's offer to Lakefront was *bona fide* in that the Club did not assign its right of first refusal in violation

of a lease provision; and (2) the trial court erred in dissolving the temporary restraining order and denying the plaintiff's motion for a preliminary or permanent injunction on the basis that the Club would suffer no irreparable harm and that the Club had an adequate remedy at law.

We affirm.

Lakefront Realty Corporation (Lakefront) was created as a result of the 1947 reorganization of the bankrupt Lake Shore Athletic Club. A second product of this reorganization was the Lake Shore Club of Chicago (the Club), a not-for-profit social and athletic club. Ownership of Lakefront stock is restricted to dues-paying members of the Club.

Lakefront owned the land and buildings at 850 North Lake Shore Drive, Chicago, Illinois (the 850 property). It also owned the personal property therein. All of this property had been leased to the Club since 1947 per various leases.

On October 28, 1971, Lakefront and the Club entered into a new lease and option to purchase agreement for a term beginning June 30, 1973, up to and including June 30, 1977. Under the terms of this agreement, the Club was given the right and option to purchase the 850 property during the term of the lease for consideration specified in the agreement.

The Club's right of first refusal, which formed the basis for count I of the complaint, arose from article 6 of the lease. The pertinent parts of article 6 are as follows:

"ARTICLE 6. (1) The Lessor may, without the consent of the Lessee, sell the PROPERTIES at any time subsequent hereto to a purchaser other than the Lessee subject to the following conditions:

(a) That the Lessor shall send a notice in writing to the Lessee that it has received a written offer to purchase the PROPERTIES, which offer has been approved for acceptance, subject to the rights of the Lessee hereunder, by the Board of Directors of the Lessor and its Stockholders, to which notice a copy of such offer made to the Lessor shall be attached.

(b) If within one hundred and twenty (120) days following the mailing of such notices and a copy of the offer to the Lessee, the Lessee shall not have made a bona fide offer to purchase the PROPERTIES on the same terms and conditions as those embodied in the offer, a copy of which has been attached to the notice to the Lessee, or, if the option provisions contained in Article 5 hereof are then in full force and effect, the Lessee shall not within one hundred and twenty (120) days following the mailing of such notice have given its notice to the Lessor of its intention to

exercise said option and within sixty (60) days after the expiration of said one hundred and twenty (120) days shall not have tendered to the Lessor the purchase price for the PROPERTIES."

Another pertinent provision of the lease, namely, article 23 formed the basis for one of Lakefront's defenses. Article 23 is as follows:

"ARTICLE 23. Lessee and Lessor agree that they will not make any assignment of this lease, or any part thereof, without in any case first securing the written consent of the other party."

In 1975, Lakefront and Northwestern University (Northwestern) began negotiating for the sale of the 850 property. On March 31, 1977, the parties executed a contract by which Lakefront agreed to sell the property to Northwestern. This sale was approved on May 10, 1977, by more than two-thirds of Lakefront's shareholders, all of whom were also members of the Club. The closing was to take place on or before July 1, 1977.

On June 30, 1977, the Club filed suit against Lakefront. In count I of its complaint, the Club sought specific performance of its right of first refusal and temporary, preliminary, and permanent injunctive relief preventing the sale of the 850 property to Northwestern until the Club had an opportunity to exercise its right of first refusal.

In count II, the Club sought to enjoin the sale to Northwestern on the ground of breach of the partnership formed between the Club and Lakefront.

In count III, the Club sought an accounting and an order dissolving the partnership in the event that the relief sought in counts I and II was denied.

On June 30, 1977 the Club also presented an emergency motion for issuance of a temporary restraining order to prevent the closing of the sale to Northwestern.[1] The court granted the motion and issued the order based on the finding that the Club would suffer irreparable harm by losing its right of first refusal under article 6 of the lease and therefore the facilities which it and its members had occupied for over 50 years.

The temporary restraining order was extended from time to time until August 22, 1977, when the court requested that the Club submit its offer to purchase the 850 property. The Club then presented its offer, along with a cashier's check for $75,000 as earnest money.

In order to finance its offer to Lakefront, the Club entered into a separate contract for the sale of the 850 property with Fleetwood Realty Corporation (Fleetwood). Various terms of this agreement are relevant to our discussion of this case. Article 10 of the Fleetwood agreement provided that the Club was to vacate the premises immediately upon

---

[1] Northwestern obtained leave to intervene and participated in all hearings before the court.

conveying title. Article 11 expressed the intent of Fleetwood to develop the premises as a condominium for residential, rental, club, or other uses. It provided, *inter alia*, that the Club *may* call upon Fleetwood to construct a club facility in the development having an area of up to 100,000 square feet. (Emphasis added.) If the Club chose to exercise this right, it was then to purchase the Club facility for an amount equal to 100% of Fleetwood's net construction cost.

From August 22 through August 26, 1977, the court held an evidentiary hearing for the purposes of determining the question of the Club's ability to make a *bona fide* offer and the propriety of the Club's request for a preliminary or permanent injunction against Lakefront's sale of the 850 property to Northwestern. During this hearing, Mr. Rauch, a real estate consultant retained by the Club in mid-July, 1977, testified that the Club's financial condition at the time in question was such that the Club could not obtain traditional financing. He therefore retained an architect and contractor on behalf of the Club to develop a schematic by which the 850 property could be put to a higher and better use than a clubhouse. Rauch presented this schematic to Bernard Feinberg, one of Fleetwood's principals. Rauch confirmed that under his and Fleetwood's plan, the clubhouse would be razed, but that the Club would have an option to purchase up to 100,000 square feet in Fleetwood's new condominium building at construction cost.

Feinberg was also called as a witness by the Club. He testified that if Fleetwood constructed a new condominium building, the Club's sole right under the Fleetwood contract would be its option to purchase the property. He stated that the Fleetwood agreement contained no provision for leasing or renting any space to the Club, and that the Club had no right whatsoever under the Fleetwood contract to veto Fleetwood's plans to tear down the structure. Joseph Pinter, a member, director, and vice-president of the Club, and a shareholder of Lakefront, stated that the Club's treasury balance was between $43,000 and $100,000 and that therefore the Club had obtained a loan to finance its purchase of the 850 property. Upon further questioning, he revealed that the entire purchase price was to be advanced by Fleetwood in return for the immediate conveyance of title pursuant to the contract of sale between the Club and Fleetwood. He testified that he had no knowledge of when, if ever, the Club could expect to resume quarters in the new building to be erected by Fleetwood. Pinter also stated that the Fleetwood agreement was to be submitted to the Club members for their approval, but that no plans for obtaining other funds existed if the members rejected the Fleetwood agreement.

Mr. Biersborn, Jr., also a member and director of the Club and a Lakefront shareholder, testified as to his recollection of various meetings

of the Club's board of directors, including a June 22, 1977, meeting at which the Club decided to file this suit and the August 19, 1977, meeting at which the Club's offer to purchase the 850 property from Lakefront and the Fleetwood agreement were authorized. He stated that none of the Club's directors had actually seen the Fleetwood agreement until after they had cast their vote. Biersborn testified that the property would be deeded or sold to Fleetwood after the Club acquired title and that there was no guarantee by Fleetwood as to how the property would be developed. Further testimony revealed that no definite plans existed by which the Club could purchase or lease space in the structure.

At the close of the hearing, the trial court delivered an oral opinion dismissing, with prejudice, count I of the Club's complaint, dissolving the temporary restraining order, and denying the Club's request for either a preliminary or permanent injunction against the sale of the 850 property to Northwestern. The court based its dismissal of count I on the finding that the Club's offer to Lakefront was not *bona fide* because the Club had in effect assigned its right of first refusal to Fleetwood in violation of article 23 of the Club's lease by agreeing to transfer the 850 property to Fleetwood. Injunctive relief was denied on the grounds that Lake Shore Club had not demonstrated irreparable harm or damage and that Lake Shore Club had an adequate remedy at law. Counts II and III of the complaint were stricken with leave to amend.

First we note that the directors and officers of the Club received written notice of the sale in late March or early April 1977. Joseph Scanlan, president of Lakefront, mailed a letter addressed to James Millhouse, president of the Club, a copy of which was sent to all officers and directors of both the Club and Lakefront. However, no copy of the Northwestern contract was attached to this letter as required by article 6 of the Club's lease with Lakefront.

The trial court found that the Club received the equivalent of proper notice on May 10, 1977, when the shareholders of Lakefront approved the sale to Northwestern. Most of the shareholders were also members of the Club, and therefore the Club had notice of the sale.

In fact, several of the Club's officers were present at this meeting, including Mr. Pinter, Mr. Millhouse, and Mr. Biersborn, Jr. Furthermore, Joseph Scanlan testified that a copy of the Northwestern contract was available for inspection at this meeting, but no one requested a copy.

■■■ On appeal, the Club first contends that its right of first refusal was not assigned to Fleetwood in violation of the nonassignability clause contained in its lease with Lakefront. We agree with this as a correct abstract proposition of the law. Where a purchaser enters into an independent contract of sale with a third party, and promises to convey if, as, and when the purchaser acquires title to the property, there is no

assignment. *Lovins v. Kelley* (1960), 19 Ill. 2d 25, 166 N.E.2d 69; *Handzel v. Bassi* (1951), 343 Ill. App. 281, 99 N.E.2d 23.

In the event that Lakefront had accepted the Club's offer, only the Club, not Fleetwood, would have owed Lakefront a duty of performance. The Fleetwood agreement was separate and independent from the Club's offer to Lakefront and did not, in any way, create an obligation on the part of Fleetwood toward Lakefront. Fleetwood's only duty was owed to the Club after the Club had acquired title to the 850 property. Therefore, the Club did not legally assign its right to Fleetwood.

■■ Secondly, the Club argues that its offer to Lakefront was *bona fide*. Generally, the "ready, willing, and able" standard is applied in assessing whether an offer is *bona fide*. (See, *e.g., Western Pride Builders, Inc. v. Zicha* (1974), 23 Ill. App. 3d 770, 320 N.E.2d 181; *Greenwald v. Marcus* (1954), 3 Ill. App. 2d 495, 123 N.E.2d 139.) In order to meet this standard, the purchaser must be able to command, in his own name, the funds necessary to perform the offer. (*Epstein v. Howard* (1955), 5 Ill. App. 2d 553, 126 N.E.2d 162; *William C. Bender & Co. v. Tritz* (1949), 338 Ill. App. 661, 88 N.E.2d 519 (abstract).) In *Epstein*, the court stated that the ability to command funds refers to the purchaser's own abilities; it must not be necessary for him to depend upon a third person who is not bound to furnish the money and over whom the purchaser has no control. Furthermore, a court of equity is reluctant to aid a party who assumes no financial responsibility on a contract, but seeks to hold a vendor in the hope of a resale. *H.M.R., Inc. v. Boeckenhauer* (1962), 24 Ill. 2d 65, 179 N.E.2d 613; *Willhite v. Schurtz* (1920), 294 Ill. 309, 128 N.E. 551.

■ The trial court found that the Club's offer to Lakefront was not *bona fide* because the Club had, in effect, assigned its right of first refusal. This determination should not be disturbed unless contrary to the manifest weight of the evidence. *Willis v. Rich* (1964), 30 Ill. 2d 323, 196 N.E.2d 676; *Elliott v. Pure Oil Co.* (1956), 10 Ill. 2d 146, 139 N.E.2d 295.

The trial court also found that Joseph Pinter did not understand the Fleetwood contract; the directors of the Club were not informed of the provisions of the contract; the assumption of the directors that the Club would have a right to lease space from Fleetwood in the new structure was mistaken and that the Club could merely be carrying out the ends of Fleetwood by proceeding with the contract.

The evidence and testimony presented at the hearing clearly indicate the Club's inability to purchase the property from its own funds. The maximum amount cited for the treasury funds was $100,000 and the Club therefore had no ability to borrow the necessary funds on its own credit. The Club then contracted to sell the property to Fleetwood in return for funds with which to purchase the property. However, this sale was

contingent upon the approval of the Club's members, and consequently, no enforceable agreement existed between the Club and Fleetwood at the time the Club presented its offer to Lakefront.

Plaintiff argues that the Club members approved the sale in August 1977 by responding to a poll taken by the Club. The results of this poll indicated that approximately 52% of the Club's members wanted the Club to continue to exercise the right of first refusal. The Club states that these results indicate the members' ratification of any procedure taken by the Club to exercise its right.

However, the letter sent to the members requesting a response to the poll made no reference to the Fleetwood agreement. In fact, the Fleetwood agreement was not yet in existence. The letter merely stated that the board of directors would continue to screen offers from developers and attempt to raise the mortgage funds. Therefore, the members could not have and did not approve the sale to Fleetwood.

■ While it is true that a purchaser need not have command over the needed funds at the time an offer is made, he must nonetheless command the funds at the time payment is required under the terms of the contract. (*Garrett v. Babb* (1975), 24 Ill. App. 3d 941, 322 N.E.2d 217; *William C. Bender & Co. v. Tritz* (1949), 338 Ill. App. 661, 88 N.E.2d 519 (abstract).) Here, the Club's ability to command funds was speculative and depended entirely upon Fleetwood. If the Fleetwood agreement was not approved by the Club members, Fleetwood would necessarily have withdrawn its financing. Therefore, the Club would have been unable to tender a *bona fide* offer within the time allowed.

Furthermore, we note that the very existence of the Club at the time the Fleetwood agreement was entered into is questionable. The members paid their last dues on May 1, 1977, and no further dues were required after June 30, 1977, when the lease between the Club and Lakefront expired. The members disbanded during August 1977. This evidence casts further doubt on the validity of the Fleetwood agreement and, therefore, on the ability of the Club to tender a *bona fide* offer to Lakefront. It is unclear whether any membership existed from which the Club could obtain approval.

The Club argues that the case of *Handzel v. Bassi* (1951), 343 Ill. App. 281, 99 N.E.2d 23, completely controls the assignment issue involved in this case. However, the *Handzel* case is distinguishable in several respects.

First, Handzel's suit was based upon a fully executed and partially performed written contract of sale with Bassi, pursuant to which Handzel had paid approximately one-half of the purchase price and tendered the balance. Here, the Club based its suit on its right of first refusal and the ensuing offer to Lakefront, which as previously discussed, was not a valid

offer. Furthermore, the Club had tendered only one per cent of the purchase price.

Second, Handzel sought to enjoin an exercise of a forfeiture right. The court in *Handzel* granted the injunction and stated that forfeiture provisions should not be enforced where the purchaser offers and is able to complete the performance of the contract. There is no forfeiture question in the case at bar because the Club is not being involuntarily divested of any property. (*Rao Electrical Equipment Co. v. Macdonald Engineering* (1970), 124 Ill. App. 2d 158, 260 N.E.2d 294.) Also, as discussed above, the Fleetwood agreement was not an enforceable agreement at the time the Club presented its offer to Lakefront and therefore the Club, unlike Handzel, failed to show an ability to perform.

Furthermore, Handzel sought to prevent a restraint on his rights of alienation. A pre-emptive right, such as the Club's right of first refusal, is a restraint on alienation. (*Gatton v. Page* (1976), 44 Ill. App. 3d 559, 358 N.E.2d 685.) Therefore, the Club is *seeking to restrain* Lakefront's right of alienation.

Also, Handzel's contract to sell the property to a third party was factually independent of the original contract between Handzel and Bassi and was a fully executed, enforceable contract. Here, the Club's offer to purchase the 850 property and its contract to sell to Fleetwood were inextricably intertwined. The Club was to receive all the funds necessary to purchase the property from Fleetwood. Furthermore, the Fleetwood contract was not enforceable at the time the offer was made because it had not yet been approved and could not be approved by the Club's members.

Considering all of these factors, it seems clear that the offer to purchase was not actually made by the Club, but was made by Fleetwood. It follows that the purported exercise of the right of first refusal was ostensibly made by the Club, but it was in truth and in fact made by Fleetwood. Thus, in our opinion, the assertion that there was legally no express assignment of the right of first refusal by the Club to Fleetwood is, strictly speaking, correct as an abstract proposition. However, in truth and in actuality this record shows Fleetwood as the actual author of a purported exercise of the right of first refusal which was vested exclusively in the Club. This is tantamount to an attempted assignment of the right of first refusal by the Club to Fleetwood in total violation of article 23 of the lease above pointed out.

■■ Plaintiff further argues that the trial court erred in dissolving the temporary restraining order and denying plaintiff's motion for preliminary or permanent injunctive relief. The trial judge dissolved the temporary restraining order after the hearing on the ground that it would

be inequitable to continue the order. The court found that Lakefront and Northwestern were being injured by the delay created by the Club's suit and that it was unjust to prevent defendants from closing the sale after the Club failed to submit a *bona fide* offer. We find no error in the court's action. The law is clear that an injunction or restraining order may be dissolved where the court finds that equity no longer justifies its continuance. *Benson v. Issacs* (1961), 22 Ill. 2d 606, 177 N.E.2d 209.

■ At the evidentiary hearing, the Club had the burden of proving that it was entitled to injunctive relief. (*Edgewater Construction Co. v. Percy Wilson Mortgage & Finance Corp.* (1976), 44 Ill. App. 3d 220, 357 N.E.2d 1307.) In order to meet this burden of proof, it was necessary for the Club to establish by a preponderance of the evidence that: (1) it possesses a certain and clearly ascertained right which needs protection; (2) it will suffer irreparable injury without the protection of the injunction; (3) there is no adequate remedy at law for the injury; and (4) plaintiff is likely to be successful on the merits. *Stocker Hinge Mfg. Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 642, 377 N.E.2d 1125, 1130; *S & F Corp. v. American Express Co.* (1978), 60 Ill. App. 3d 824, 828, 377 N.E.2d 73, 76.

The decision to grant a preliminary injunction rests within the discretion of the trial court and the only question reviewed on appeal is whether there was sufficient showing to sustain the order granting or denying relief sought. *Schwalm Electronics, Inc. v. Electrical Products Corp.* (1973), 14 Ill. App. 3d 348, 302 N.E.2d 394.

The court below determined that the Club failed to satisfy its burden because the Club was unable to show irreparable harm. We find ample evidence in the record supporting this conclusion. The Club had no actual, definite rights of ownership or possession under the terms of the Fleetwood agreement. The agreement contained no lease provision, nor was the Club bound to purchase any space in the building for Club facilities. In fact, Fleetwood was permitted, by the very terms of its contract with the Club, to sell to Northwestern at a future date, subject only to a right of first refusal in the Club. In other words, the Club had nothing if the property were transferred to Fleetwood. Furthermore, the Club's ability to purchase Club facilities in the event that Fleetwood built a new structure is speculative since the funds in its treasury were, at best, $100,000.

The Club states that it will be irreparably harmed by Lakefront's sale to Northwestern because it will thereby lose a unique piece of realty which has been its home for over 50 years. However, by the very terms of the Club's contract with Fleetwood, the structure could be demolished or sold, thereby leaving the Club without facilities once again. In the event that the structure itself was razed and a condominium development put in

its place, the Club would have to purchase space and equipment so that it would have Club facilities. No evidence was presented showing the Club's ability to raise the necessary funds.

Here, too, we must point out the questionable existence of the Club. Since the Club's members disbanded during August 1977, no need for a clubhouse for the members existed, and the Club cannot allege that it will suffer irreparable harm by losing its Club facilities.

Furthermore, the Club failed to demonstrate a probability of ultimate success on the merits. As discussed above, the offer to purchase the property was, in actuality, made by Fleetwood and therefore, Fleetwood exercised the right of first refusal which was vested exclusively in the Club. Consequently, the Club failed to show that it could properly exercise its right of first refusal within the time allowed.

For the foregoing reasons, we affirm the order of the circuit court of Cook County finding that the Club's offer was not *bona fide* and the court's order denying injunctive relief.

Order affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.