William D. BOGGESS et al., Plaintiffs,

v.

Jack R. HOGAN et al., Defendants.

No. 69 C 2267.

United States District Court,
N. D. Illinois, E. D.

Dec. 22, 1975.

James P. Chapman, William J. Harte, Kevin M. Forde and James R. Madler, Chicago, Ill., for plaintiffs Boggess, Ness and Collins and the plaintiff class.

Robert S. Atkins, Freeman, Freeman & Atkins, Ltd., Chicago, Ill., for plaintiff objectors Glenn Greenwood, Amy Greenwood, Ruth Greenwood, and Florence Green.

Arthur T. Susman, Prins, Flamm & Susman, Ltd., Chicago, Ill., for class member objectors Louis R. Miller, Jean Russell Miller, Lois Russell Mello and Ogda Russell Nelson.

Thomas A. Reynolds, Jr., Richard Williams, III, Kurt L. Schultz, Winston & Strawn, Chicago, Ill., for defendants Walter H. Lenhard, Jr., Teledyne, Inc., Teledyne Financial Corp., and Unicoa Corp.

Keith F. Bode, Arthur M. Martin, Jenner & Block, Chicago, Ill., for the executors of the estates of defendants O. T. Hogan and Almore H. Teschke.

Samuel H. Shapiro, Stephen C. Shamberg, Friedman & Koven, Chicago, Ill., for the executors of the estate of defendant O. T. Hogan.

## MEMORANDUM AND ORDER

ROBSON, Senior District Judge.

This cause is before the court pursuant to Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure for approval of a settlement agreement of a class action and derivative action brought by the shareholders of the United Insurance Company and on behalf of Unicoa Corporation. For the reasons hereinafter stated, approval of the settlement shall be granted.

Named plaintiffs [1] represent a class, as certified by this court on October 31,

---

1. Boggess owned United stock on May 6, 1968. Pursuant to the formation of the holding company, Unicoa, he received an equivalent number of shares in that corporation. All shares were sold pursuant to Unicoa's cash offer of May 1970. Ness, Collins, Glenn Greenwood and Amy Greenwood owned stock in United as of May 6, 1968 which they continue to own as shares of Unicoa. Ruth Greenwood owned shares of United prior to May 1968. A portion was tendered as Unicoa stock pursuant to the Unicoa cash offer of March 1972 and the bal-

1973, consisting of all persons who owned United common stock on May 6, 1968 except the defendants.[2] The defendants include the estates of O. T. Hogan and Almore H. Teschke, former officers and directors of United, Walter H. Lenhard, Jr., an officer and director of United and of Unicoa, Unicoa Corporation, Teledyne Financial Corporation and Teledyne, Inc. Objectors include four of the seven named plaintiffs and four class members.

This litigation was initiated in 1969. The complaint has been amended several times and presently consists of two counts. Count I of the Third Amended Complaint alleges a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. Plaintiffs allege that on or about June 1, 1967 Teledyne commenced upon a scheme and conspiracy to gain control of United, to purchase the remaining shares for less than fair value and to exploit the assets of United for Teledyne's benefit. It is alleged that, as the initial step in this scheme, Teledyne sought to purchase a majority interest in United by means of a cash tender offer but failed as a result of United's opposition.

Teledyne then allegedly entered into a secret agreement with Hogan and Teschke pursuant to which they agreed to support Teledyne's take-over of United; and, in return, Teledyne agreed to purchase the Hogan and Teschke holdings in a third company at a fixed price. A second cash tender offer was then made, the side deal was not disclosed, and Teledyne was successful in acquiring control of United. As a result, plaintiffs were misled to believe that Hogan and Teschke were acting in United's best interests in recommending the second Teledyne tender offer when in fact they were motivated by personal gain. Plaintiffs further complain of material omissions and misrepresentations made in: (1) proxy material sent to United shareholders which ultimately resulted in the formation of the holding company, Unicoa; (2) Unicoa's subordinated debenture exchange offer of February 1970; and (3) Unicoa's cash offers of May 1970, December 1970 and March 1972. The formation of Unicoa, Unicoa's anti-dividend policy, and Unicoa's offers are all alleged to be in furtherance of Teledyne's conspiracy to gain control of United/Unicoa for less than fair value. These actions are alleged to be not only a violation of federal securities law but also a violation of fiduciary duty.

Count II of the Third Amended Complaint is a derivative action brought by present Unicoa shareholders, Ness, Collins, Glenn Greenwood, Amy Greenwood and Ruth Greenwood, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. In addition to the conspiratorial acts alleged in Count I to be in violation of federal and state law, plaintiffs complain that: (1) Unicoa's assets have been used to finance and support the conglomerate structure of Teledyne; (2) Teledyne has diverted certain corporate opportunities which properly belong to Unicoa or United; and (3) Unicoa's purchase of its own stock pursuant to the debenture exchange and cash offers constituted mismanagement and waste of Unicoa's assets, a breach of fiduciary duty and an illegal scheme to preserve control of Unicoa for Teledyne.

### Terms of the Proposed Settlement

If the compromise is approved by the court, defendants will pay $1,000,000 in full settlement of the class action. From this amount will be deducted: (1) ex-

---

ance has been retained. Florence Green owned shares of United prior to May 1968 and sold a portion of her shares of United pursuant to Teledyne's May 6, 1968 cash tender offer. The balance was sold as Unicoa stock pursuant to Unicoa's March 1972 cash offer.

**2.** The class was defined as it was because those who acquired shares of United/Unicoa subsequent to May 6, 1968 could not have been injured by the acts of which plaintiffs complain except to the extent that Teledyne caused injury to Unicoa. These shareholders who have retained their stock would have indirect redress if the derivative action were successful.

penses incurred in notifying the class; (2) expenses incurred in administrating the terms of the settlement; and (3) reasonable fees and expenses of plaintiffs' lawyers. The parties estimate that each class member would be entitled to receive approximately 12 cents for each share of United common stock owned on May 6, 1968. No monetary compensation would be paid in return for settlement of the derivative action.

In return for payment of the $1,000,-000 the settlement agreement provides, among other things, that: (1) all "Settled Claims"[3] in this lawsuit will be dismissed with prejudice to plaintiffs and all other members of the "Class"[4]; (2) all other actions involving the "Settled Claims" shall be enjoined and barred; and (3) prosecution of a class action brought on behalf of any "Class" member who has not accepted the settlement, which is in any way related to the instant litigation, shall be barred. The settlement further provides that Unicoa will release the other defendants from all liability either as alleged in the complaint or which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in this action.

### Statement of Uncontested Facts

Commencing in the summer of 1967, various members of the Board of Directors of United met with representatives of Teledyne to discuss Teledyne's interest in acquiring United. A press release was issued on September 13, 1967 announcing that Teledyne and United had agreed in principle on a plan under which Teledyne would acquire all of United's common stock. Each share of United was to be exchanged for approximately $40.00 in Teledyne securities.

On September 25, 1967 Teledyne made a cash tender offer to purchase 2.5 million shares of United common stock at $35.00 per share. The majority of the United Board of Directors opposed the offer as not in the best interests of the United shareholders. Letters in opposition were mailed to shareholders by United per J. R. Hogan, Co-Chairman of the Board of Directors, and A. D. Johnson, Secretary. As a result of this tender offer, Teledyne acquired only 1.7 million shares or 23% of United.

On October 17, 1967 United's Board of Directors unanimously adopted a resolution authorizing the officers of United to do such acts necessary to form a holding company. Proxy statements were mailed by United in March 1968 soliciting shareholder votes for the plan of exchange whereby United would become a wholly-owned subsidiary of Unicoa. The proxy stated that the holding company was being formed to enable United to avoid state laws which prevented insurance companies from engaging in a wider variety of financial enterprises. The proxy further stated that an initial 20 cents per share quarterly dividend was contemplated by Unicoa with future dividends to depend on earnings, financial requirements and similar factors.

At the April 16, 1968 annual meeting of shareholders, the resolution authorizing the plan of exchange was adopted. Teledyne voted all of its shares of United in favor of the resolution. At this meeting four Teledyne officers or directors were elected as directors of United. Nine United directors were re-elected.

On May 6, 1968 Teledyne made a second cash tender offer to purchase 2.1 million shares of United at $35.00 per share. The offer was not opposed by

---

**3.** "Settled Claims" is defined in the settlement agreement as "any and all claims, demands or causes of action, which are alleged in the complaint . . . or which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint and amended complaints in this action." Stipulation of Settlement ¶ 1(e).

**4.** "Class" is defined in the settlement agreement as "all persons or entities who owned the common stock of United on May 6, 1968, except the defendants herein and those persons or entities who have previously exercised their right to be excluded from the Class . . . . ." Stipulation of Settlement ¶ 1(b).

United. United, per Walter H. Lenhard, President, sent a letter to all shareholders, enclosing a copy of Teledyne's cash tender offer, stating that each shareholder should arrive at his own independent decision with regard to the offer. Various United directors tendered some of their shares to Teledyne as did the United Savings and Profit Sharing Pension Fund. The offer was oversubscribed and Teledyne purchased only the 2.1 million shares thus increasing to 52% its aggregate ownership of United's common stock.

On September 1, 1968 the United/Unicoa plan of exchange became effective. Unicoa became the sole owner of all the United common stock. The former shareholders of United became shareholders of Unicoa. United had paid a quarterly cash dividend of 20 cents per share in four of the previous five years. On October 15, 1968 United's Board of Directors unanimously adopted a resolution omitting the quarterly cash dividend. Unicoa's Board of Directors adopted a similar resolution, that same day, which also stated that it would be the policy of the Board to retain all earnings for use in corporate expansion.

A press release, issued by Unicoa on October 16, 1968, stated that the Directors had voted to omit the current quarterly cash dividend. It further stated that Unicoa intended to retain earnings for use in expansion but that the declaration of cash dividends would be considered in the future. A November 30, 1968 letter to shareholders from Unicoa indicated that the quarterly cash dividend had been omitted and that the surplus was to be used in expansion. No further cash dividends were declared by Unicoa. The above two statements and the 1968 annual report, mailed to shareholders in March 1969, were the only general communications to shareholders which related to the cessation of dividends during the period October 15, 1968 through February 15, 1970.

Unicoa offered to exchange subordinated debentures for up to 1.5 million of its common shares on February 6, 1970.

The exchange offer contained a statement indicating that the Board of Directors had decided to discontinue cash dividends in 1968. Cash offers to purchase Unicoa shares were made by Unicoa in May 1970, December 1970, March 1972, and April 1973. As a result of these offers, Teledyne's ownership in Unicoa increased to 91% as of December 31, 1974.

United made loans to Unicoa of approximately $43.6 million during the years 1970–1972. The First National Bank of Chicago loaned Unicoa $14.1 million during the years 1972–1973. This money was used in part to purchase Unicoa common stock during 1970, 1972, and 1973 ($44.4 million) and to pay interest on Unicoa's debentures during 1970–1972 ($3.9 million). United paid Unicoa $47 million in cash dividends during the years 1970–1974. This money was used to repay the loans made to Unicoa by United and by The First National Bank of Chicago, except for $500,000 which was used to pay Unicoa accounts payable.

United Insurance Company has acquired four life insurance companies since 1968. Pyramid Life was purchased in January 1968 for $14.67 million. Superior Life was purchased in July 1970 for $3.34 million. Coastal Plain Life was purchased in May 1973 for $10.15 million. General Life of Wisconsin was purchased in December 1974 for $11.15 million.

*Evaluation of the Settlement*

 This court sits as a disinterested third party to the proposed compromise. The court represents absent class members and acts as guardian of the rights of the corporation. It is not the function of the court to determine the merits of this litigation, however, as the purpose of compromise is obviously to avoid a trial. *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). The court's responsibility is to determine whether the settlement taken as a whole is fair, adequate, and reasonable. *Unit-*

*ed Founders Life Ins. Co. v. Consumers Nat. Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971). While many factors have been suggested as relevant to this inquiry,[5] the court is of the opinion that its role is best satisfied if it weighs the probabilities of success and compares the likely rewards of successful litigation with the terms of the proposed settlement. *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085–86 (2d Cir.), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co., Inc.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

■ This court is of the opinion that an initial presumption of fairness and adequacy has been established. The record discloses that the settlement has been arrived at after arm's length negotiations. There has been sufficient discovery taken to enable counsel and the court to act intelligently.[6] Proponents of the settlement are counsel experienced in similar litigation. Finally, the number of objectors or the interest they represent is not large.[7] *Feder v. Harrington*, 58 F.R.D. 171, 174–75 (S.D.N.Y.

1972); *Kerr v. Bess*, [1973–1974 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,375 at 95,296 (S.D.N.Y.1974). The initial presumption, however, must still withstand the test of plaintiffs' likelihood of success.

■ Initially the court notes that there exists a recent legal development which weighs heavily in favor of the proposed settlement. The class, as certified by this court, is comprised of all persons, excluding defendants, who owned United common stock as of May 6, 1968. However, the United States Supreme Court has recently held that only "purchasers or sellers"[8] have the requisite standing to assert an individual cause of action under Rule 10b–5, not those who fail to sell because of misrepresentations. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

Count I of the Third Amended Complaint alleges that United insiders Hogan and Teschke violated the securities laws by entering into a secret side deal in exchange for their support of the second Teledyne cash tender offer. Both the objectors and the plaintiffs agree that the probability of such a finding is substantial based upon judicial admissions made in a related action[9] and in deposi-

5. These factors, somewhat interrelated, include complexity and nature of the litigation, the amount of discovery completed, potential costs and risks attendant to trial, the likelihood of establishing liability and damage, the risks of maintaining the class action throughout the trial, opposition of the class to the settlement, the fairness of the settlement notices and the extent to which other viable claims are waived. *See, e. g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975); 7A Wright & Miller, Federal Practice and Procedure: Civil §§ 1797 and 1839. Many, if not all, of these issues are discussed in the course of this opinion.

6. Objectors contend that discovery, on the merits, has been insufficient. The court disagrees. Over 15 depositions have been taken in this and related cases. Furthermore, objectors have relied almost exclusively on materials previously available to the plaintiffs as the basis for their argument against the settlement.

7. The class is comprised of some 18,000 members who held over 5 million shares of United

common stock as of May 6, 1968. Objectors who appeared at the settlement hearing held approximately 17,000 shares of United stock as of May 6, 1968. While four of these individuals are named plaintiffs, the record indicates that they initially approved the settlement but later changed their position. Class counsel suggested that the four plaintiffs raise objection at the hearing if they so desired. This was done. In addition, approximately ten individuals wrote to counsel indicating disapproval of the compromise.

8. Section 3(a)(13) of the 1934 Act, 15 U.S.C. § 78c(a)(13), provides that the term "purchase" includes "any contract to buy, purchase, or otherwise acquire" securities. Section 3(a)(14) of the 1934 Act, 15 U.S.C. § 78c(a)(14), provides that the term "sale" includes "any contract to sell or otherwise dispose of" securities.

9. *Hogan v. Teledyne, Inc.*, 328 F.Supp. 1043 (N.D.Ill.1971), vacated with directions to dismiss as moot, Civil No. 71–1630 (7th Cir. 1973).

tion testimony. The estates of Hogan and Teschke do not concede liability in any way and note that Teschke alone testified to a side agreement which related to Teledyne's second tender offer. Furthermore, as Teschke died before his deposition was completed, and his signature was never waived, a question of law exists as to whether the deposition would be admissible at a trial. Assuming that liability is prima facie, the court must then consider the anticipated amount of recovery.

Objectors have conceded that the price paid for the United stock pursuant to the second tender offer was fair. It is also undisputed that the side deal was never consummated and that Hogan and Teschke were not unjustly enriched. Absent proof of participation in a larger conspiracy, Hogan and Teschke would not appear to be liable to the class for damages. Shareholders who failed to tender in 1968 did not rely on the alleged advice of these United insiders and therefore were not injured. They would also appear to lack standing under *Blue Chip Stamps v. Manor Drug Stores, supra,* unless they tendered at a later date and could prove that Hogan and Teschke were aiders and abettors with Teledyne in its alleged scheme to defraud. *SEC v. First Securities Co. of Chicago,* 463 F.2d 981, 987–88 (7th Cir.), *cert. denied sub nom. McKy v. Hochfelder,* 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972).

Objectors also contend that Teledyne had a positive duty to disclose its antidividend policy in its cash tender offers of 1967 and 1968 regardless of whether or not it was a fiduciary of United or a co-conspirator with Hogan and Teschke. There exists an unresolved legal issue as to whether an outside cash tender offeror had an affirmative disclosure obligation in 1968, under Rule 10b–5, in the absence of express misrepresentations or half-truths. *Mills v. Sarjem Corp.,* 133 F.Supp. 753 (D.N.J.1955); *Jacobsen Mfg. Co. v. Sterling Precision Corp.,* 282 F.Supp. 598 (E.D.Wis.1968); *Mutual Shares Corp. v. Genesco, Inc.,* 384 F.2d 540 (2d Cir. 1967); A. Bromberg, Securities Law § 6.3 at 121–122.8 (1969). Assuming arguendo that Teledyne did owe plaintiffs a duty of disclosure and that Teledyne did in fact have such a policy with respect to United, the court is then faced with the issue of recoverable damage.

Absent proof of a larger scheme or conspiracy to defraud, it again appears that recovery by non-tenderors is highly tenuous in light of *Blue Chip Stamps.* The argument that "but for" the nondisclosure all would have tendered flies in the face of this recent decision of the Supreme Court. Furthermore, it is agreed that the 1968 Teledyne tender offer was oversubscribed and that all shares tendered in excess of the offer were rejected. Finally, even if all members of the class had tendered in 1968, plaintiffs would still have to prove that the subsequent drop in the market price of Unicoa was related to the alleged scheme. Damage to the class would appear to be highly speculative.

This discussion assumes, of course, that Teledyne did in fact have an antidividend policy with respect to United in 1967 and in 1968 and that this is material information. The defendants deny that such a policy then existed and note that a 20-cent per share cash dividend was approved by the United Board of Directors in 1968 after Teledyne had acquired 52% of the stock and had four of its people on the Board. Defendants also suggest that an anti-dividend policy may not have been material in view of the fact that insurance stocks are traditionally bought for long term growth as opposed to current yield. Finally, Teledyne contends that its corporate policy of not paying cash dividends was a matter of public knowledge.

Objectors contend that the standing requirement has been met because all class members were involved in the fraudulently induced exchange in which United shares were substituted for shares of Unicoa. It is also evident that as Teledyne now controls 91% of the shares of Unicoa pursuant to the succession of exchange and cash offers (all of

which are alleged to be a part of the overall conspiratorial scheme), sales have been made by the vast majority of the class in connection with the alleged violation. *Travis v. Anthes Imperial Limited,* 473 F.2d 515, 521–22 (8th Cir. 1973). Whether either theory satisfies the requirements of *Blue Chip Stamps* is a contested legal issue which I will not decide. However, I do note that objectors' theories presuppose the existence of a conspiracy.

Turning to the issue of plaintiffs' probability of success as to the liability of the defendants as conspirators and the plan of Teledyne to gain control of United, suppress dividends, acquire minority holdings for less than fair value, and exploit the assets of United, objectors have presented the expert testimony of Milton Meigs [10] and many exhibits which it is contended establishes at least prima facie liability.

Objectors' conclusion that the evidence of a conspiracy is clear and convincing appears to be based primarily upon the testimony of Meigs. He stated that Teledyne commenced upon a scheme and conspiracy to gain control of United in 1967 basing this opinion on the precision of subsequent events. As Teledyne now controls over 90% of Unicoa and has invested over $100 million, any contrary inference was, to him, incredible. Further, reliance is placed on the statement of uncontested facts, recited in part *supra,* and the close working relationship which Meigs assumed existed between Teledyne and United insiders.

The court has serious misgivings as to the basis of the conclusion of the objectors and their expert. There has been no testimony by any person, other than Meigs, which would connect the Teledyne tender offers of 1967 and 1968 to subsequent events. The expert himself testified that many of the actions of

which plaintiffs complain were in and of themselves not fraudulent. While the court agrees that a conspiracy may be proved by circumstantial evidence, and that self-serving denials of the defendants do not prove them "pure of heart," nevertheless the evidence adduced may very well be based upon instances explicable, as the defendants contend, without reference to a continuing pattern of events. *Hoffman-La Roche, Inc. v. Greenberg,* 447 F.2d 872, 875 (7th Cir. 1971).

The record reveals that more than 75% of all life insurance companies comparable to United adopted the holding company form of ownership before and after the creation of Unicoa. It also appears, although contested, that the formation of Unicoa had its genesis prior to Teledyne's involvement in the management of United. There is no real evidence indicating that Teledyne had any involvement in the preparation of the proxy statement mailed to the United shareholders nor is there testimony indicating that the statements contained in the proxy were false when made.

The expert admitted on cross-examination that had Teledyne wished to eliminate the United minority, it could have effected a simple merger once the 52% interest was acquired. *Furthermore, if Unicoa had paid cash dividends, the majority of these monies would have been payable to Teledyne. Teledyne could then have used the money to make open market purchases.*

Objectors' attempts to tie Hogan and Teschke to the conspiracy are likewise tenuous. Little evidence has been adduced which would indicate any participation in a prearranged unlawful plan. *Dasho v. Susquehanna Corp.,* [1969–1970 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 92,575 at 98,623 (N.D.Ill.1970), *rev'd in part,* 461 F.2d 11 (7th Cir.), *cert. denied,*

---

10. The defendants have moved to strike the testimony of the expert on the grounds that he lacks the qualifications necessary to testify and that neither an adequate foundation nor sufficient facts were presented to support his opinions. The motion is denied. The record reveals that the defendants did not raise objections to the qualifications of the witness at the settlement hearing. The court stated that the opinions would be admitted subject to cross-examination. *See* Federal Rules of Evidence 602, 702–705.

408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972). It is suggested that these insiders must have known of Teledyne's plan because of the alleged close working relationship that existed. However, the facts reveal that Hogan and Teschke tendered approximately one-half of their holdings in United pursuant to the tender offers of Teledyne. It is difficult to believe that these men would fail to tender all of their holdings in United if they had knowledge of the alleged scheme to depress the market price of their holdings.

As to the derivative claim, proponents of the settlement contend that Unicoa may not maintain this cause of action as an alleged wrongdoer, Teledyne, presently owns 91% of Unicoa's stock. *Bangor Punta Operations, Inc. v. Bangor & Aroostock R. R. Co.,* 417 U.S. 703, 716–17 n. 13, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974); *Jannes v. Microwave Communications, Inc.,* 385 F.Supp. 759 (N.D.Ill. 1974). It is true that Teledyne would be the principal beneficiary of any derivative recovery; however, the court does not necessarily agree that the facts in the instant situation would bar a derivative securities fraud action in the name of Unicoa. In any event, qualified minority shareholders could recover in their personal capacities. *Jannes v. Microwave Communications, Inc.,* 385 F.Supp. at 760. Again, however, the court is faced with contested legal and factual issues similar to those surrounding the claims asserted in Count I.

For example, defendants contend that there was a valid business purpose for the termination of Unicoa dividends. The fourth quarter 1968 dividend was omitted for fear of adverse tax consequences while later dividends were omitted because management was of the opinion that both the corporation and its shareholders would be benefited through growth. Similarly, defendants contend that the debenture and cash offers had a legitimate corporate purpose. Debenture interest was deductible by Unicoa while dividends were not; furthermore, the 7% rate payable on the debentures represented a greater return to the shareholders than did dividends. The cash offers are contended to be a benefit because they resulted in increased earnings per share.

While there may be merit in withholding judicial sanction to a compromise wherein the consideration is going only in one direction, this settlement involves a compromise of both the class and derivative causes of action. The court does not feel that each should be considered in a vacuum. Unicoa is receiving consideration in the form of absolution from liability on the cause of action asserted in the class action. Minority shareholders of Unicoa, who have never sold any of their stock, are benefiting to the extent that they are members of the class and will share in that recovery.

Many of the aforementioned legal and factual issues were raised by counsel for plaintiffs at the initial settlement hearing. They have further suggested that even if liability were established, the class might not recover more than the amount of the settlement. The Teledyne cash tender offers, as well as the Unicoa debenture exchange and cash offers, were all made at a premium above market. While objectors contend that the price of Unicoa was depressed in 1970 and the relevant subsequent years because of the anti-dividend policy, serious problems as to causation are involved. The market price of United stock dropped from above $60 a share in 1964 to about $30 in 1967 prior to any involvement by Teledyne. Furthermore, the stock market itself was generally declining during the years in issue. Finally, it would appear to be somewhat incongruous to suggest that the securities laws were violated because of a failure to reveal an anti-dividend policy and then to suggest that public knowledge of that policy caused the market price of Unicoa to slip.

The court has not attempted to cover all of the issues raised by the objectors. To do so would require it to reach ultimate issues of law and fact which this court does not believe is either necessary

or proper. What the court has attempted to do, however, is to suggest that the amount offered in compromise is not outweighed by plaintiffs' likelihood of success on the merits. Even if the prospect of plaintiffs' recovery were greater, the amount of damage recovery appears to be too speculative to warrant the withholding of judicial sanction.

*Due Process Claims*

■ Objectors contend that the Federal Rules of Civil Procedure and due process were violated because the notices of settlement in the class and derivative actions were individually mailed but never published. The Federal Rules of Civil Procedure do not require that notices of a proposed settlement be published. Rather, notices of compromises are to be furnished class members and shareholders "in such manner as the court directs." Fed.R.Civ.P. 23(e) and Fed.R. Civ.P. 23.1. The United States Supreme Court has stated that individualized notice by mail to the last known address best satisfies the requirements of notice in class action contests. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174–77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). It follows, and has been so held, that due process is not violated when notices are individually mailed but not published. *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

Publication, as suggested by the objectors, was considered and rejected because the individuals who did not receive the mailed notices were, according to their last known addresses, scattered throughout the country. Additional steps were taken to inform class members of the pending settlement. Shareholders with ownership in excess of 1000 shares were traced through telephone directories and a skip tracer was hired to locate those shareholders with ownership in excess of 300 shares. Notices mailed to brokers, banks or other nominees included a form directing the nominee to supply the name of the beneficial owner and the beneficiaries were then mailed individualized notices. Class members who still remained unlocated were notified of the proposed settlement by registered mail.

The objectors also raise due process arguments as to the contents of the settlement notices. A general objection is made that the notices are deficient in that they did not reveal that several named plaintiffs objected to the settlement and that the settlement of this cause would be a bar to related actions. Specific objection is made to the derivative settlement notice on the ground that it fails to inform the recipient of the nature of the derivative claim being settled and on the ground that the notice fails to inform that the derivative claim is being settled for no payment. Objection is raised to the class settlement notice alleging failure to articulate with specificity the claims asserted and failure to give a damage estimate so that a comparison could be made with the terms of the settlement.

■■ It is a generally accepted principle that due process requires that the notice of a settlement proposal must reasonably apprise members of the class of the terms of the settlement and of the options open to those who would dissent. *Air Lines Stewards and Stewardesses Ass'n, Local 550 v. American Airlines, Inc.,* 455 F.2d 101, 108 (7th Cir. 1972); *Grunin v. International House of Pancakes,* 513 F.2d 114, 122 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). In addition, the notice should be neutral and include the best available information concerning fees and expenses together with an estimated range of unitary recovery. *Grunin v. International House of Pancakes,* 513 F.2d at 122; Manual for Complex Litigation § 1.46 (1973).

[9] The notices sent in the instant litigation meet the prescribed due process standards. The general nature of the settlement proposal was stated as was the cause of action upon which the complaint was based and the estimated

amount of recovery. There is no authority for the proposition that the notices explore all of the underlying issues in the lawsuit. Ambiguities regarding the substantive aspects of the litigation could be resolved by examining the pleadings on file with the clerk.

■ The notices sent are substantially modeled after those serving as exemplars in the Manual for Complex Litigation § 1.45 (appendix) (1973). While the derivative settlement notice may be deficient standing alone, the court notes that it was mailed with the class settlement notice. The class notice did outline with specificity the cause of action upon which it was based and both the derivative and class claims are substantially identical. Finally, the derivative notice expressly stated that if the settlement were approved by this court, it would result in dismissal of this litigation and all claims on the merits with prejudice. It is clear that no monetary consideration was to pass.

■ The settlement agreement is not intended to bar further prosecution of pending litigation or to effect the rights of those who have elected to opt out of the class other than to bar the future prosecution of related claims as class actions. As opt-outs have had a reasonable opportunity to litigate these claims on a class basis, the court declines to hold that this provision is repugnant to considerations of due process.

■ Finally, the record reveals that the four named plaintiffs who raised objections to the fairness of the compromise did so after the settlement notices were mailed to the class. Prior to the mailing, counsel for the class had been advised by these persons, through Glenn Greenwood, that they approved the proposed compromise. The proponents of the settlement could obviously not advise the class of objections that did not exist when the notices were mailed.

It is therefore ordered that the motion to strike the testimony of Milton Meigs shall be, and the same hereby is, denied.

It is further ordered that the settlement agreement submitted in this cause shall be, and the same hereby is, approved.

It is further ordered that the objections to the settlement agreement shall be, and the same hereby are, dismissed.