DEAN L. BUNTROCK *et al.*, Plaintiffs-Appellees, v. JUDITH TERRA *et al.*, Defendants-Appellants (Terra Foundation for the Arts *et al.*, Defendants-Appellees; The People *ex rel.* Lisa Madigan, Attorney General, Plaintiff and Intervenor-Appellee).

First District (5th Division)   No. 1—01—3152

Opinion filed May 28, 2004.

Morris & De La Rosa, of Chicago (Joseph A. Morris and Charles H. Bjork, of counsel), for appellants.

Sidley, Austin, Brown & Wood, of Chicago (William F. Conlon, Stephen C. Carlson, Susan A. Stone, Lori LePar Roeser, and Tillman J. Breckenridge, of counsel), for appellees.

Lisa Madigan, Attorney General, of Chicago (Gary Feinerman, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of counsel), for intervenor-appellee.

Clausen Miller, P.C., of Chicago (James Ferrini, of counsel), and Public Citizen Litigation Group, of Washington, D.C. (Alan B. Morrison and Michele Host, of counsel), for *amicus curiae*.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendants, Judith Terra, Paul Tucker and Alan K. Simpson[1] , are three former directors of the Terra Foundation for the Arts (the Foundation), a not-for-profit corporation that operates an art museum in Chicago. The defendant directors appeal from a court-ordered settlement that terminated the litigation by plaintiffs, Dean Buntrock and Ronald Gidwitz, two other directors of the Foundation, and by the plaintiff-intervenor, the office of the Illinois Attorney General. On appeal, the defendant directors contend that the trial court improperly approved the settlement without an independent inquiry into whether or not the settlement was fair, adequate, reasonable and in the best interests of the Foundation, whether or not plaintiffs were likely to succeed on the merits, and whether there were conflicts of interests as a result of the intervention of the Attorney General.

The Foundation filed a response brief as a defendant-appellee in the suit by the plaintiff-intervenor, the Attorney General of Illinois, and the Attorney General filed a separate brief in response to the brief of the defendant directors. For the following reasons, we affirm the judgment of the trial court.

BACKGROUND

Daniel Terra was a wealthy industrialist, diplomat and philanthropist, an avid collector of modern American art, a financier for the Republican Party, and the first ambassador-at-large for cultural affairs under President Reagan. In 1978, Terra, along with his wife, Adeline E. Terra, established the Terra Museum of American Art as an Illinois not-for-profit corporation "organized exclusively for charitable, educational, literary or scientific purposes," specifically including establishing and operating "a museum." Terra opened a museum in Evanston in 1980. At its inception, the Foundation had three directors, including Terra and his son James Terra. The original gift and subsequent gifts to the Foundation by Terra approximate $450 million. Adeline Terra died in 1982. Terra eventually acquired adjoining parcels of land on North Michigan Avenue in Chicago for the purpose of expanding his museum.

In 1986, at the age of 75, Terra married Judith Banks (Judith Terra) of Washington, D.C. After his marriage, Terra continued to maintain his longtime residence in Kenilworth, Illinois, and also kept a second residence with Judith in Washington, D.C. That same year, Terra began taking steps toward the opening of a museum of American

---

[1]Former United States Senator of Wyoming.

art in Giverny, France (the Giverny Center), adjacent to the well-known museum devoted to the works of Claude Monet. Terra contributed the French property he acquired to the Foundation.

The Foundation relocated the Terra Museum to the new building located at 664-666 North Michigan Avenue in 1987, exhibiting a collection that included works by noted American artists John Singleton Copley, Winslow Homer and James Whistler.

In 1992, in anticipation of the opening of the Giverny Center, the Foundation's name was legally changed from "The Terra Museum of American Art," to "The Terra Foundation for the Arts." The stated purpose for the name change was "to accommodate the project in France and to clearly define that there will be two museums under the umbrella of the Foundation." Following the opening of the Giverny Center, the Foundation's articles of incorporation were amended to state its purposes, including operating "museums and schools, both in the United States and abroad." The Foundation's bylaws were similarly modified.

On June 28, 1996, at the age of 85, Terra died suddenly following a massive stroke. In the spring of 2000, after the settlement of Terra's estate, the Foundation board appointed a strategic planning committee to consider a cooperative relationship with a major arts institution. The Foundation received proposals of cooperation from the Art Institute of Chicago, the Corcoran Gallery of Art and the National Gallery of Art, both located in Washington, D.C., and the Museum of Fine Arts in Boston. At a board meeting in August 2000, Foundation board member Dr. Paul Hays Tucker circulated a memorandum to the board, at that time consisting of 11 members, advocating the closing of the Chicago museum and the relocation of its collection to Washington, D.C., for exhibition in collaboration with the National Gallery of Art. Director Margaret Daley[2] said that she did not recall any discussion of "abandoning" Chicago. Director Buntrock[3] commented that moving the Foundation had not been previously discussed by the board. Dr. Tucker responded that the strategic planning committee would recommend this option to the board and that the board should make a definite decision the following month.

The board scheduled a formal discussion of the alternatives raised by the strategic planning committee for its annual board meeting, to take place at the Foundation's museum in Giverny, France, on September 26, 2000.

On September 22, 2000, prior to the annual board meeting, direc-

[2]Wife of the Mayor of Chicago, Richard M. Daley.

[3]Former chief executive officer of Waste Management, Inc.

tors Buntrock and Gidwitz[4] filed an action in the circuit court of Cook County, against the three director defendants and Naftali Michaeli,[5] alleging mismanagement of the Terra Museum after Terra's death and seeking an injunction to prevent the board from convening an unscheduled meeting to alter the composition of the board and to prevent any decision to close the museum or transfer its art collection to another institution. Plaintiffs alleged that although a board meeting was scheduled for September 26, 2000, the defendant directors unlawfully scheduled a pre-board meeting for September 24, 2000, with the intention to remove Buntrock from the board as a result of his opposition to the closing of the Chicago museum. Plaintiffs alleged that the defendant directors would have the votes necessary to remove Buntrock at the unlawful meeting on September 24, 2000, but not at the regular board meeting on September 26, 2000.

The complaint further alleged that defendants had committed various breaches of their fiduciary duties to the Foundation, including a "conscious effort" to "cause the failure of Terra Museum in Chicago to justify closing Terra Museum," including orchestrating replacements of Foundation board members and "stacking Terra Foundation's Board" with loyalists to Judith Terra; moving the Foundation's Chicago-based art collection to Washington, D.C., contrary to the donative intention of Daniel Terra; holding illegal executive committee meetings in violation of the bylaws; consulting and taking advice from defendant Michaeli, despite the fact that Michaeli is not an officer, director or employee of the Foundation; making significant expenditures on art without obtaining input or approval from the board; and wastefully incurring excessive legal fees.

On September 25, 2000, the Attorney General moved to intervene as an additional plaintiff, pursuant to the Charitable Trust Act (760 ILCS 55/16(b) (West 2002)), filing her complaint against the three director defendants and the Foundation. James Terra was later permitted to intervene as a plaintiff, both personally, as Terra's heir, and as executor of Terra's estate, seeking to prevent the transfer of the Foundation's art collection to another city.

The trial court granted the plaintiffs' motion for a temporary restraining order, allowed the Attorney General to intervene as a plaintiff, authorized expedited discovery, and set the matter for further hearing in two weeks. The interlocutory injunction was continued throughout the course of the litigation through subsequent orders.

---

[4]Former chief executive officer of Helen Curtis Corp., and chair of the Illinois State Board of Education.

[5]Naftali is an Israeli citizen, a Washington, D.C., socialite, and personal friend of Judith Terra's who has no official position with the Foundation.

On February 5, 2001, at the suggestion of the three defendant directors, the trial court ordered the parties to pursue mediation, appointed a mediator from among candidates proposed by the defendant directors, and stayed the proceedings. The defendant directors explained their desire to pursue mediation in order to obtain releases of the individual claims filed against them, which, if sustained, would prevent them from being reimbursed for legal fees under the Foundation's bylaws. Before agreeing to mediation, the assistant Attorney General (AAG) for the charitable trust division stated his opposition to any settlement under which the Foundation's art collection would be moved away from the Chicago area.

During the course of mediation, when it appeared that no settlement could be reached and the stay would be lifted, the AAG drafted an amended complaint adding director Dr. Theodore Stebbins as an additional defendant and alleging that Stebbins breached his fiduciary duties to the Foundation in connection with potential purchases of artworks. At the same time, the Attorney General received information that Dr. Stephanie Marshall, another board member, was involved in another charity which was engaged in a serious violation of the law. The Attorney General initiated an informal inquiry into the matter and promptly determined that the information was inaccurate. The Attorney General treated the matter as closed.

After more than four months of mediation, the Foundation and the Attorney General reached a tentative agreement to settle the case. However, shortly before the meeting scheduled for the board to vote on whether, and on what terms, the Foundation should agree to a settlement, the defendant directors filed an action in federal court seeking to enjoin the Foundation from pursuing the settlement. The federal court dismissed the case. The defendant directors immediately filed a motion in the trial court to enjoin any action by the board that would permit the Foundation to implement the settlement. The trial court denied this motion.

On June 29, 2001, 8 of the board's 11 members, including two of the three defendant directors, attended a board meeting, either in person or by telephone. The conversation was recorded and transcribed. The meeting included a lengthy discussion about the Attorney General's actions relating to Stebbins and Marshall, each of whom then stated that their votes were motivated by the best interests of the Foundation, and not encouraged by any actions of the Attorney General. Following a lengthy discussion of the terms of the settlement, the board voted 6 to 2 in favor of a resolution that the Foundation enter into the settlement. Defendant directors Judith Terra and Dr. Tucker voted against the resolution. Defendant Simpson did not participate in the meeting, either in person or by telephone.

The Foundation filed a motion for court approval of the settlement, and the trial court set a briefing schedule and a hearing date for the motion. The defendant directors filed objections, accompanied by voluminous attachments, contending that the settlement contravened Daniel Terra's donative intent and the Foundation's charitable purposes, and that the Attorney General's actions relating to Dr. Stebbins and Dr. Marshall invalidated their votes in favor of the settlement and, as a result, the Foundation's approval of the settlement. The Foundation, the Attorney General and the plaintiff directors filed separate responses to these objections, and the defendant directors filed a reply in support of their opposition to approval of the settlement. The defendant directors also filed a motion for leave to take discovery in support of their objections and separately moved for leave to file counterclaims.

Among the materials submitted by the defendant directors along with their filed objections was a 1990 memorandum from Daniel Terra to the board in which he: (1) described the Foundation's ongoing operating deficits, as well as similar deficits in the other two major museums of American art; (2) expressed his concerns about the "viability" of "the whole concept of a Museum of American Art"; and (3) listed various options for the Foundation to address this problem over the long term, including, as a last resort, no longer operating a museum. These materials also included evidence that in the last months of his life, Terra explored the possibility of opening a museum in Washington, D.C.

On July 24, 2001, a hearing commenced on the Foundation's motion for approval of the settlement. The trial court approved the settlement with one minor change regarding what the parties agreed to say about the settlement. The court specifically found that the settlement was a "just and appropriate conclusion" to the litigation; that it did not place significant restrictions on the Foundation's ability "to conduct its mission of providing education and art throughout the world"; and that the "very, very contested and *** tortuous history" of the litigation, in which "there has been a contest [on] virtually every issue that has been raised," the board, which the court described as not having been "functional *** for almost a year now[,] *** will be able to make decisions *** [a]nd the business of art will be able to go ahead, as opposed to the business of litigation."

The trial court further found that it reviewed the transcript and listened to the audio tape of the board's meeting regarding the settlement and found no basis to conclude that Marshall and Stebbins were "intimidated" by the Attorney General. The trial court found that under the Illinois not-for-profit act, Marshall and Stebbins were not

"interested Board members," but instead could properly participate in the Foundation's decision to enter into the settlement. The trial court held that there was nothing in the defendant directors' papers that warranted a contrary conclusion or justified discovery for the purposes of investigating their conduct. Prior to issuing its ruling entering the settlement, the trial court denied the defendant directors' motion for leave to take discovery, stating: "There is nothing here in anything I have received *** that makes me believe that discovery is necessary or anything further is necessary to investigate in this case." The trial court further denied the defendant directors' motion to file counter-claims. The trial court noted that petitions for attorney fees remained, "which the Consent Decree requires me to adjudicate." The trial court entered the consent judgment and order on July 26, 2001.

On August 6, 2001, the first petition for attorney fees was filed. On August 22, 2001, the defendant directors filed their notice of appeal seeking immediate review of provisions of the consent order not relating to attorney fees.

OPINION

## I. Jurisdictional Issues

Plaintiff-intervenor the Illinois Attorney General and defendant Terra Foundation for the Arts (the Foundation) have raised the issue of this court's jurisdiction to hear this appeal. The Attorney General and the Foundation argue that the defendant directors' appeal is premature, as the trial court expressly reserved for later determination the amount of attorney fees to be paid by the Foundation and did not enter a Rule 304(a) (155 Ill. 2d R. 304(a)) finding authorizing immediate appeal of the consent order.

Supreme Court Rule 301 provides for a right of appeal from a "final judgment." 155 Ill. 2d R. 301. To perfect such an appeal, a party must, under Supreme Court Rule 303 (155 Ill. 2d R. 303), file a notice of appeal during the 30-day period following the entry of such a judgment, or if a party files a timely posttrial motion directed against the judgment, following the disposition of that motion. *John G. Phillips & Associates v. Brown*, 197 Ill. 2d 337, 340-41, 757 N.E.2d 875, 877-78 (2001). A notice of appeal filed either before or after that period is ineffective. *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 468-69, 563 N.E.2d 459 (1990) (premature notice of appeal); *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 538, 470 N.E.2d 290, 292 (1984) (late notice of appeal).

The Attorney General and the Foundation argue that the consent order is not final and appealable because it disposes of less than all of

the claims in the case. In support, the Attorney General and the Foundation argue that a "claim" within the meaning of Rules 301 and 304 includes a right to recover attorney fees from another party, regardless of the asserted basis for the right, citing, *inter alia, John G. Phillips*, 197 Ill. 2d at 340-41. Thus, a notice of appeal resolving other matters in the case is premature where the order leaves unresolved an issue regarding a claimed entitlement to, or the amount of, attorney fees recoverable from another party. *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill. App. 3d 674, 679-80, 794 N.E.2d 843, 848 (2003) (holding that where the court retained jurisdiction to hear the claim for fees, any other judgment entered before decision on that claim "was nonfinal and nonappealable" absent a Rule 304(a) finding).

The defendant directors replied that jurisdiction is proper, citing the consent order as follows:

"12. Reasonable attorneys' fees incurred by the Foundation's Directors in connection with this lawsuit, as determined by the Court, shall be paid by the Foundation.

13. These actions are hereby dismissed with prejudice, without any admission of wrongdoing or liability on the part of the Foundation or any of its Directors, each of whom specifically denies any wrongdoing or liability. The Court retains jurisdiction over the actions and the parties solely for purposes of enforcing the terms of this Consent Judgment and Order and for such further orders and directions as may be necessary or appropriate for the construction and effectuation of this Consent Judgment and Order."

The transcript of proceedings discloses the following statement of the trial court:

"Once this document is signed, this case will be over. All claims that the plaintiffs have brought will be dismissed with prejudice. And this litigation will be done.

\* \* \*

Mr. Cummins, there comes a time that all litigation has to be ended. And this litigation is going to be ended tomorrow in this Court with the signing of these orders.

And the only thing that is going to remain is the Petitions for Attorney's fees, which the consent decree requires me to adjudicate. And if I am wrong I am sure that the Appellate Court will tell me I am wrong and I will see you all back here."

In denying the defendant directors' request to certify their question on the filing of a counterclaim, the trial court further stated:

"Well, once I sign that [the consent order], I don't have to certify anything. You have got a final order and you can go up to the Appellate Court tomorrow."

We note that none of the pleadings before the trial court contained

a "claim" for attorney fees in the action, because the disputing parties did not have any claim to fees against each other by statute. Any entitlement to attorney fees was provided for in the agreement giving rise to the consent order.

In addition, the applications for attorney fees filed in this case do not satisfy the elements of a "claim" for purposes of Rules 301 and 304(a). In *Mars v. Priester*, 205 Ill. App. 3d 1060, 1064, 563 N.E.2d 977, 980 (1990), this court determined that a claim for attorney fees is defined as a "claim" within the meaning of the applicable supreme court rules when it is "a matter involved in the action; it is a possible right of plaintiff and a possible liability for defendant." Here, attorney fees were not involved in the litigation.

■ The record on appeal clearly shows that the trial court intended that the "Consent Judgment and Order" be final and appealable and reserved the right to determine the amount of attorney fees to be paid by the Foundation as incidental to the consent judgment. As the right to attorney fees in this litigation does not derive from statute, the determination of attorney fees does not constitute a "claim" for purposes of this appeal, and our jurisdiction is proper.

■ Next, the Foundation raises the issue of the defendant directors' standing to bring this appeal. The Foundation contends that the defendant directors participated in the litigation both as members of the board of directors of the Foundation and as individual defendants. The Foundation initially argues that the individual defendants cannot establish standing because it is the Foundation, not the individual defendants, that is the party to the settlement with the plaintiffs. The Foundation argues that as individual defendants, the defendant directors have not demonstrated that as codefendants, their legal rights were adversely affected by the settlement, and, in fact, as a result of the settlement, the claims against the defendant directors were dismissed and the defendant directors became beneficiaries of an express agreement of the Foundation to pay all board members' reasonable attorney fees.

The Foundation further argues that the defendants lack standing to bring this appeal as directors of the Foundation because they were not parties to the action in their capacity as directors, but as individuals. The Foundation argues that the interests of the corporation as a party are represented by the decisions of the entire board of directors under the Foundation's articles of incorporation, bylaws and applicable law, and that the three defendant directors cannot show any basis for nonparty standing.

Only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment. *Marino v. Ortiz*, 484 U.S. 301, 304,

98 L. Ed. 2d 629, 633, 108 S. Ct. 586, 587 (1988). To have standing to bring an appeal, a nonparty must have a " ' "direct, immediate, and substantial interest in the subject matter, which would be prejudiced by the judgment or benefitted by its reversal." ' [Citations.]" *Success National Bank v. Specialist Eye Care Center, S.C.*, 304 Ill. App. 3d 74, 76, 710 N.E.2d 482, 484 (1999). The Foundation argues that the defendant directors do not allege any invasion of their individual legal rights or an injured pecuniary interest resulting from the consent judgment, nor does any case or controversy exist as to them.

The record shows that when Buntrock and Gidwitz brought their action against the defendant directors, they identified the defendant directors in their capacities as directors of the Foundation; therefore, the Foundation recognizes that the defendant directors have standing in the lawsuit. The cases cited by the Foundation in support of its position against standing involve circumstances when nonparties, who were never joined in an action, and who never successfully intervened in the action, sought to appeal a judgment. Such is not the case here.

The Foundation has not shown how the defendant directors do not have standing to appeal from a judgment entered in an action instituted against them, both in their individual capacity, and as directors of the Foundation. We therefore proceed to the merits of the appeal of the defendant directors.

## II. The Appeal of the Defendant Directors

■ The defendant directors contend that the trial court improperly approved the settlement of a derivative action without an independent inquiry into whether or not the settlement was fair, adequate, reasonable and in the best interests of the corporation, whether or not plaintiffs were likely to succeed on the merits, and whether there were conflicts of interest as a result of the intervention of the Attorney General.

An appellate court will not review a consent order because an order entered by consent is no more than a court's recording of an agreement reached by the parties in settlement of a dispute and is not a judicial determination of their rights. *People ex rel. Fahner v. Colorado City Lot Owners & Taxpayers Ass'n*, 106 Ill. 2d 1, 8, 476 N.E.2d 409, 412 (1985). An order cannot be reviewed on appeal unless the trial court was required to make a judicial determination. *Rao Electrical Equipment Co. v. Macdonald Engineering Co.*, 124 Ill. App. 2d 158, 173, 260 N.E.2d 294, 301 (1970).

The defendant directors argue that the suit filed by plaintiffs is derivative because it alleged no injury distinct from the alleged injury to the Foundation. Defendants cite no authority in support of their proposition.

The Foundation responds that the underlying complaints are not derivative lawsuits. Plaintiffs Buntrock and Gidwitz brought their action under the Illinois General Not for Profit Corporation Act of 1986 (Not for Profit Act) (805 ILCS 105/103.15(a) (West 2002)), which creates a right of action to enjoin *ultra vires* actions by a not-for-profit corporation. The statute provides in pertinent part as follows:

"§ 103.15. Defense of Ultra Vires. No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer, but such lack of capacity or power may be asserted:

(a) In a proceeding by a member entitled to vote or by a director against the corporation to enjoin the doing of any act or acts or the transfer of real or personal property by or to the corporation. If the unauthorized acts or transfer sought to be enjoined are being, or are to be, performed or made pursuant to any contract to which the corporation is a party, the court may, if all of the parties to the contract are parties to the proceeding and if it deems the same to be equitable, set aside and enjoin the performance of such contract, and in so doing shall allow to the corporation or the other parties, as the case may be, compensation for the loss or damage sustained by either of them which may result from the action of the court in setting aside and enjoining the performance of such contract, but anticipated profits to be derived from the performance of the contract shall not be awarded by the court as a loss or damage sustained;

(b) In a proceeding by the corporation, whether acting directly or through a receiver, trustee, or other legal representative, or, to the extent provided for by Section 107.80 of this Act, through a member in a representative suit, against the officers or directors of the corporation for exceeding their authority[.]"

The language of the Not For Profit Act demonstrates that the plaintiffs' complaint did not state a claim for a shareholder derivative action but, rather, asserted a statutory, nonderivative claim by directors of a not-for-profit corporation. The complaint was not brought "by the corporation" but, rather, "by a director," as provided under section 103.15(a), and under the Act, is a nonderivative action.

An *ultra vires* claim against a corporation is not a derivative action. *Skokie Valley Professional Building, Inc. v. Skokie Valley Community Hospital*, 74 Ill. App. 3d 569, 393 N.E.2d 510 (1979). There, a contributor-member of the hospital brought an action under section 103.15 against the hospital and against certain donors to enjoin allegedly *ultra vires* activities by the hospital. The court distinguished the

claim against the hospital from the claim against the donors, finding that the claim against the donors was derivative in nature while the claim against the hospital was not.

The complaint contains no allegations reflecting the requirements of a derivative lawsuit, such as a claim for demand or futility of demand on the Foundation's board of directors. "[T]he demand requirement imposes as a prerequisite to a derivative suit that the [claimant] make a demand upon the board of directors to enforce a corporate right or demonstrate that extraordinary conditions exist to excuse such a pre-suit demand." *Silver v. Allard*, 16 F. Supp. 2d 966, 968 (N.D. Ill. 1998).

Next, the defendant directors contend that the Attorney General was improperly allowed to intervene in the lawsuit, that the intervention caused conflicts of interest, and that the Attorney General ultimately coerced the settlement, resulting in a flawed consent order. The defendant directors argue that the Attorney General caused Director Stebbins to believe that he would be charged with personal improprieties absent a settlement, and took steps to investigate Director Marshall, creating pressures on these two Foundation directors.

The Attorney General was permitted to intervene as a plaintiff under the Illinois Charitable Trust Act (760 ILCS 55/1 *et seq.* (West 2002)). The Attorney General is a necessary party to litigation over whether charitable assets are properly devoted to their governing charitable purposes and are being administered in accordance with charitable trust principles. See *People ex rel. Scott v. George F. Harding Museum*, 58 Ill. App. 3d 408, 413, 374 N.E.2d 756, 760 (1978).

The defendant directors complained to the trial court that they believed the two directors changed their votes on the settlement due to coercion on the part of the Attorney General. The record shows that the trial court listened to audio tapes of the board meeting wherein the settlement was voted on, reviewed the transcript of the tape of the meeting, and found that the decision of two board members in favor of the settlement was not the product of coercion. The trial court concluded that there was no disqualifying conflict because there was no proof that the two directors had actually changed their declared positions as a result of the acknowledged personal pressures:

> "I listened to the way Ms. Marshall voted and what she said and how she said it *** as well as Dr. Stebbins and what he said and how he said it.
>
> * * *
>
> This was a lady who was in control."

With regard to Stebbins, the trial court concluded that the tape

revealed "no shaky voice, nothing at all" that would indicate a conflict produced by the Attorney General's pressure.

There is a strong policy in favor of settlement in order to avoid costly and time-consuming litigation. *Security Pacific Financial Services v. Jefferson*, 259 Ill. App. 3d 914, 919, 632 N.E.2d 299, 303 (1994). The protections contemplated in requiring court approval of derivative suits are not applicable here. The defendant directors are correct in stating that courts oversee settlements in derivative suites to protect absent shareholders or class members who may not be aware of the settlement or its terms. *Boggess v. Hogan*, 410 F. Supp. 433, 437 (N.D. Ill. 1975) ("The court represents absent class members and acts as the guardian of the rights of the corporation"). However, the Foundation does not have any shareholders and the present case is not a derivative action.

In order to show a conflict of interest in the settlement and entry of the consent order, the defendant directors must make a *prima facie* case showing of interest by the directors that conflicts with the interests of the Foundation. The defendant directors did not establish that Directors Stebbins and Marshall were "interested" in the settlement or were "directly or indirectly a party to the" settlement, as required by section 108.60, in order to establish a conflict of interest.

The defendant directors further contend that the trial court's approval of the settlement was an abuse of discretion because the plaintiffs were "highly unlikely" to prevail on their claims concerning the permissible use of the Foundation's assets.

It is well established that a charitable foundation is required to use its assets in conformity with its charitable purposes, as determined by the court in case of any doubt. *In re Estate of Tomlinson*, 65 Ill. 2d 382, 387-88, 359 N.E.2d 109, 111-12 (1976); *Board of Education v. City of Rockford*, 372 Ill. 442, 449-54, 24 N.E.2d 366, 371-72 (1939). The Foundation's articles of incorporation constitute the starting point for ascertaining these purposes.

The same rules governing the construction of contracts apply to trust instruments or other documents establishing a charitable entity. *Stroh v. Blackhawk Holding Corp.*, 48 Ill. 2d 471, 474-75, 272 N.E.2d 1, 3 (1971) (articles of incorporation of an Illinois corporation constitute a contract). Here, the materials submitted to the trial court demonstrated the existence of a *bona fide* claim that the Foundation's key charitable purpose was the operation of a museum of American art in the Chicago metropolitan area. As originally incorporated, the Foundation's articles specifically stated, *inter alia*, that it was formed for the purpose of establishing and operating "a museum." The Foundation did, in fact, operate a museum in the Chicago metropolitan

area for 20 years from the inception of the Foundation until the initiation of this litigation. This actual history of operation constitutes strong evidence regarding the Foundation's charitable purposes. As such, the defendant directors have not shown that they would have prevailed on their claims disputing the intent of the donor of the Foundation.

Because plaintiffs' claims are not derivative lawsuits, no judicial determination was required or made in this case relating to the "adequacy" or "fairness" of the settlement. The settlement reflected the board's exercise of its inherent rights to amend the bylaws of the Foundation and to govern the Foundations' affairs. The trial court did not abuse its discretion in approving the settlement of the litigation without an independent inquiry.

We find the defendant directors' additional, multiple constitutional claims waived for review on appeal for failure to raise these claims in the trial court. *Haudrich v. Howmedica, Inc*, 169 Ill. 2d 525, 536, 662 N.E.2d 1248 (1996).

For the reasons set forth above, we therefore affirm the judgment of the trial court.

Affirmed.

O'BRIEN and HARTIGAN, JJ., concur.